MORRIS J. GRAHAM, Appellee, v. JOSEPHINE FRANK GRAHAM, Appellant.

No. 44778.

OCTOBER 24, 1939.

Curtis W. Gregory, and Howard L. Bump, for appellee.

Burton Russell, James B. Ryan, and Lehan T. Ryan, for appellant.

OLIVER, C. J.—Decedent, Morris J. Graham, and appellant, Josephine Frank Graham, were married in October, 1932. He was then about 79 years of age, a widower, with three middle-aged sons who lived elsewhere. She was a widow, about 38 years old and childless. He was deputy clerk of the district court in Adel, at a salary of $100 per month. In addition to his work as deputy clerk he was operating a 25-acre fruit and nursery farm one and one-half miles from Adel, which he had owned, operated and occupied for many years. This property was encumbered by a $1,600 overdue mortgage with delinquent taxes and interest amounting to several hundred dollars additional. There was also a considerable amount owing by Mr. Graham for bills contracted in the nursery business.

Appellant, then living in Des Moines, met decedent at his nursery in 1931, and thereafter regularly and frequently came to the place to call upon him. These visits were made on Sundays and evenings when he was home from his duties in Adel. From time to time during the year of this courtship he gave her, for the purchase of jewelry, furs, etc., and to assist with her living expenses, various sums of money aggregating about $400.

Upon the marriage of decedent and appellant they lived in his home upon the 25-acre tract. Decedent testified she refused to cohabit with him and that they never occupied

the same bed. Appellant conceded there had been no cohabitation since shortly subsequent to the marriage.

According to appellant, Mr. Graham married her, a woman much younger than himself, "to help him with the work and to make his last days easier." Apparently she considered the marriage a business arrangement and the record reveals little evidence of concern on her part as to matters other than financial. At the time of the marriage she had some dishes and linen and an automobile. In addition she claimed to have had some notes, bank deposits of $400 and $1,400 in currency which she brought to the home. The evidence and circumstances relative to this money are unsatisfactory and we do not think sufficient to sustain this contention.

It is evident that soon after the marriage she began to dominate the household and business affairs of her husband. His own automobile was sold and for a short time defendant transported him to his daily work in Adel in her car. Thereafter the aged man usually walked the one and one-half miles to and from his work, regardless of weather conditions. He was so feeble that at times it would take him several hours to recover from the effects of this exertion. Occasionally he arrived at Adel suffering from the cold, and at one of these times his face was frozen. However, on his monthly pay days appellant frequently took her husband to his work and secured and handled his salary check. After the first few months he was usually required to prepare his own breakfasts while she remained in bed. She did very little cooking or other housework and he frequently prepared his own evening meal.

In May, 1933, appellant told Mr. Graham her time was worth $3,000 per year and that she could not afford to stay out in the country without extra compensation. She prepared a note for $500 payable to herself which Mr. Graham signed, "to keep peace in the family." In the meantime she had been assuming more and more authority and control over the nursery business. On May 30, 1933, as the result of a controversy with Mr. Graham and his manager, appellant "commenced to manage the business" and thereafter was in active charge of it. In November, 1933, appellant secured another $500 note from her husband by the same procedure employed in the first instance.

In 1934, the mortgage upon the nursery was taken up by means of a new loan upon the premises executed by Mr. Graham and his sons. In 1936, Mrs. Graham secured $100 from a chattel loan company by mortgaging her husband's household goods. In January, 1935, at the request of appellant, her husband made a will giving her a life estate in his property. This will was afterwards destroyed. In February, 1936, appellant secured from Mr. Graham a power of attorney to manage the nursery business. In December, 1936, she procured from her husband a joint tenancy deed to the 25-acre nursery. She arranged to have the deed drawn and secured his signature upon the representation that she could thereby secure funds to finance the business. Appellant testified she had suggested getting a job on a salary and one reason he gave her the deed was so she would stay at home and help him. After she secured the deed a witness quotes her as stating, ''I have got what I have been after four years.'' ''The deed.''

Appellant largely devoted her efforts to handling the nursery and salary of Mr. Graham which went into the common account to be checked out by her. Although the nursery appears to have lost money continuously appellant considered ''the earning power was largely mine'', and apparently concluded all Mr. Graham's property and earnings belonged to her individually.

It was her custom to arise at 10 or 11 a. m., though upon occasions she bestirred herself earlier to partake of the breakfast prepared by Mr. Graham before he started his walk to Adel. A witness testified she frequently took her meals at his restaurant, occasionally eating there several times per day and consuming considerable time in eating and in drinking several bottles of beer with each meal. On one occasion Mr. Graham was without funds to secure breakfast and was compelled to go hungry. On this same day appellant later had her breakfast sent to her from a restaurant in Adel. Upon the plea that she was working or resting from overwork appellant spent numerous evenings and weekends away from home, making frequent trips to Des Moines, and also a number of longer vacation trips to Excelsior Springs, Clear Lake, North Carolina and elsewhere. On some of these occasions decedent was sick in bed and a woman was hired to care for him.

Mr. Graham's moderate earnings appear to have been the sole source of revenue for support of the family, and appellant, to use the words of a witness, "Was usually in need of money." Despite this situation she secured a new automobile and a fur coat.

Appellant occasionally appeared among the men employees and others around the nursery, clad only in a bathrobe which she permitted to remain open in front exposing her person. A witness testified she was intoxicated at some of these appearances.

She exhibited a violent temper, frequently quarreled with and cursed her husband, called him vile names and threatened him, at times in the presence of others. On one occasion she struck him over the head with a roll of heavy magazines and at another time attempted to strike him with her fist.

Mr. Graham's health was rapidly failing and in 1936 he lost his position. He was subject to heart attacks. His sons heard he was seriously ill, was helpless and was being left alone. Upon their arrival at his home in April, 1937, they found him unconscious and had him taken to a hospital. He was removed to the home of a son a few days later and several months later instituted this action for divorce, cancellation of the deed to the nursery and the two $500 notes.

At the trial in January, 1938, the court found that Mr. Graham was then 84 years old and very feeble physically, while appellant was 44 years of age and appeared strong and robust.

The decree granted plaintiff a divorce, cancelled the deed and notes in question, and allowed appellant only certain household goods. From said decree this appeal is prosecuted.

I. Appellee has moved to dismiss the appeal upon the ground that the death of Mr. Graham, subsequent to the decree, abated the action. The motion is overruled. The decree of divorce in this case involves property rights, therefore, the death of one of the parties is not a bar to retrial, upon appeal, of the issues involved in the divorce itself. Oliver v. Oliver, 216 Iowa 57, 248 N. W. 233.

II. Appellant contends the evidence was insufficient to justify a divorce based upon cruel and inhuman treatment. We have hereinbefore made reference to portions of the record bearing upon this phase of the case. Space does not permit

detailing numerous other matters relied upon by appellee nor the evidence and explanations of appellant and witnesses in her behalf. We think the record boils down to the mistreatment accorded a feeble old man in failing health and at times dangerously ill, and that under such circumstances the proof was sufficient to entitle him to a divorce.

III. The trial court cancelled and set aside the two $500 notes and the deed to the 25-acre nursery and homestead which had been secured by appellant from her husband. As above stated the notes were without consideration. The conveyance of the realty had been procured by appellant for the avowed purpose of securing funds in the form of loans. However, under the circumstances, we need concern ourselves only with the final disposition of the property. By section 10481, Code of 1935, the court was empowered to make such order relative to the property of the parties to the divorce action as should be right.

Appellant contributed nothing to the property of Mr. Graham, and he was left in such financial condition that it is doubtful whether his assets, including the property in controversy herein, exceeded his liabilities. The equity in the 25-acre homestead tract in controversy does not appear to have been large. With the age, health and future prospects of each of the parties taken into consideration we conclude that Mr. Graham was entitled to retain the equity in said tract and the articles of personal property thereon which belonged to him and which were awarded him by the trial court.

Wherefore, the decree of the trial court is in all respects affirmed.—Affirmed.

MILLER, MITCHELL, SAGER, HAMILTON, BLISS, HALE, RICHARDS, and STIGER, JJ., concur.